IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

SHAWN K. ODNEAL                §
    TDCJ-CID #917382         §
v.                            §          C.A. NO. C-04-454
                              §
DOUG DRETKE, ET AL.           §

## ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

    This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983.

Plaintiff, who is Native American, claims that defendants have interfered with the practice of his

religion and that such interference is not justified by any prison security issue and is in violation

of his constitutional rights.  (D.E. 1).  He is suing Billy Pierce, the Director of the Chaplaincy

Department of the Texas Department of Criminal Justice ("TDCJ") and Robert Kibbe, a Unit

Chaplain at the McConnell Unit.  For the reasons stated herein, the summary judgment motion of

defendants Pierce and Kibbe is granted, and plaintiff's claims are dismissed with prejudice.

## I.  JURISDICTION

    The Court has federal question jurisdiction over this civil rights action pursuant to 28

U.S.C. § 1331.  Upon consent of the parties, (D.E. 55, 58), this case was referred to a magistrate

judge to conduct all further proceedings, including entry of final judgment.  (D.E. 59).  See 28

U.S.C. § 636(c)(1).

## II.  PROCEDURAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS

    Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions

Divisions ("TDCJ-CID"), and is currently incarcerated at the McConnell Unit in Beeville, Texas.

He is a Native American and member of the Choctaw nation.  He filed suit on August 30, 2004,

pursuant to 42 U.S.C. § 1983, claiming that certain prison officials were violating his First and

Fourteenth Amendment rights to practice his religion, as well as violating certain provisions of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, 42 U.S.C. § 2000cc-1(a).[1]

A Spears[2] hearing was held on October 20, 2004.  At the hearing, plaintiff complained that defendants failed to employ either adequate clergy, security personnel, or volunteers to supervise Native American religious ceremonies, such that he has been denied regular access to religious ceremonies.  He asserted that TDCJ-CID regulations authorize religious ceremonies twice a month for Native American inmates, but that he and the other eighteen Native Americans housed at the McConnell Unit were provided a faith ceremony only once every two to three months.  He claims that there are nineteen units serving Native Americans, with only one Native American Chaplain to serve them.  Plaintiff also complained that the TDCJ-CID prohibited him from possessing or wearing his medicine bag at any time except going to or from a religious ceremony, and he challenged the TDCJ-CID's hair length regulation that prohibited him from wearing a kouplock.

Following the Spears hearing, it was recommended that plaintiff's claims against the TDCJ Director Doug Dretke and his claims concerning his medicine bag and kouplock be dismissed, and that his claims against Mr. Pierce, Mr. Kibbe, and Ron Teel be retained.  (D.E. 7).

_____

[1] The RLUIPA prohibits prison officials from imposing a substantial burden on the exercise of religion unless they can show that the burden serves a compelling interest and is the least restrictive means of advancing that interest.  42 U.S.C. § 2000cc-1(a).

[2] Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985); see also Eason v. Holt, 73 F.3d 600, 603 (5th Cir. 1996) (stating that testimony given at a Spears hearing is incorporated into the pleadings).

On December 20, 2004, plaintiff's claims against Doug Dretke were dismissed, as were his claims concerning his medicine bag and kouplock.  (D.E. 32, 33).

On December 28, 2004, defendants Pierce, Kibbe, and Teel filed their answer, (D.E. 36), and also sought a stay of the action based on the fact that the United States Supreme Court had granted *certiorari* in Cutter v. Wilkinson, 543 U.S. 924 (2004).  In Cutter v. Wilkinson, 349 F.3d 257 (6th Cir. 2003), the Sixth Circuit found that the RLUIPA's section 3, which applies to institutionalized persons, violates the Establishment Clause.  Id. at 267-69.  The Seventh and Ninth Circuits had previously held that RLUIPA's section 3 is a valid exercise of Congressional spending power and did not violate the Establishment Clause or the Tenth Amendment.  Charles v. Verhagen, 348 F.3d 601 (7th Cir. 2003); Mayweathers v. Newland, 314 F.3d 1062 (9th Cir. 2002).  Concluding that resolution of the constitutionality of RLUIPA's section 3 was necessary, defendants' motion to stay was granted.  (D.E. 44).  On May 31, 2005, the Supreme Court decided Cutter, holding that section 3 of the RLUIPA did not violate the Establishment Clause.  Cutter v. Wilkinson, 544 U.S. 709, 712-14 (2005).  With this issue resolved, the stay was lifted.  (D.E. 50).

On May 10, 2006, defendant Teel filed a motion for summary judgment seeking to dismiss plaintiff's claims on the grounds of failure to exhaust, failure to allege a constitutional violation, failure to allege personal involvement, and qualified immunity.  (D.E. 85).  On May 22, 2006, plaintiff filed a response to Mr. Teel's summary judgment motion, indicating that he was not opposed to the motion and requesting that it be granted.  (D.E. 92).  By order and final judgment entered May 25, 2006, plaintiff's claims against defendant Teel were dismissed with prejudice.  (D.E. 95, 96).

Defendants Pierce and Kibbe filed their motion for summary judgment on May 8, 2006. (D.E. 78).  Plaintiff has filed a response in opposition.  (D.E. 93).

### III.  SUMMARY JUDGMENT EVIDENCE AND UNCONTESTED FACTS

In support of their motion for summary judgment, defendants offer the following evidence:

> Ex. A:  Affidavit of Billy Pierce, TDCJ Director of the Chaplaincy Department;

> Ex. B:  Affidavit of Nathaniel Quarterman, TDCJ-CID Deputy Director for Prison and Jail Management;

> Ex. C:  Plaintiff's Native American Religious Designation records; and

> Ex. D:  McConnell Unit Chaplaincy Records from July 2001 through March 2006.

(D.E. 78).

The following facts are not in dispute:

Plaintiff's designation as a follower of Native American religion within the TDCJ became effective on July 21, 2001.  (PAC[3] at 2; DX-C at 1).  In his Native American Questionnaire, plaintiff indicated that he had not been raised knowing the traditions of the Choctaw, but when a friend began teaching him of the Native American traditions, "it felt right." (DX-C at 3).

The McConnell Unit is a designated Native American unit within the TDCJ-CID, where services for the Native American religion are held.  (PAC at 3; DX-C at 1-2).

---

[3] "PAC" refers to plaintiff's amended complaint, (D.E. 9), and "PR" refers to plaintiff's summary judgment response, (D.E. 92).  Reference to defendants' exhibits, (D.E. 78), will be to "DX" followed by the exhibit letter, tab reference if appropriate, and page number.

Defendant Billy Pierce is the TDCJ Director of the Chaplaincy Department.  (PAC at 2; DX-A at 1).  According to Mr. Pierce, the TDCJ maintains a list of the most common religious preferences by offenders in TDCJ custody.  (DX-A, Pierce Aff. at ¶ 5).  As of September 15, 2005, there were approximately 136 faith preferences and approximately 160,381 offenders.  Id. Providing weekly or even monthly religious services to all of these different faith groups would be "virtually impossible" due to the large number of faiths, the large number of offenders, security concerns, staffing and space limitations, and the large geographic expanse that the TDCJ covers.  Id.

The extent and frequency for observance of any religious ceremony is determined by several factors, including, the significance of the ceremony, the availability of supervision, time and space requirements, and the security concerns of the facility.  (DX-A, Pierce Aff. at ¶ 7; DX-A, Tab 2 "Procedures for Religious Programming").  Additional meeting times and space subsequent to an initial allotment for a faith group are provided based on an equitable *pro rata* formula, dependent on both the percentage of the offender population that the requesting faith group represents and the amount of time and space available for religious programming.  (DX-A, Pierce Aff. at ¶ 7).

The TDCJ employs 94 chaplains who minister to offenders and conduct religious programs.  Id. at ¶ 8.  In addition, approved religious volunteers are utilized to help with religious programs, and make over 150,000 visits to units each year.  (Id.; see also DX-A, Tab 2 at 9, ¶VIII).  The majority of the TDCJ Chaplaincy budget is allocated to administrative costs and the salaries of the chaplains and a few administrative employees.  (DX-A, Pierce Aff. at ¶ 9).

There are no funds to purchase religious materials or food.  Id.  Security for religious activities is provided by the TDCJ security budget, and is not a cost allocated to the Chaplaincy.  Id.

The TDCJ allows all offenders to worship according to their faith preferences in their cells using allowed items such as sacred texts, devotional items, and other materials.  (DX-A, Pierce Aff. at ¶ 6, ¶ 9; see also DX-A Tab 2 at 9, ¶ VI.B).  In addition, an offender may meet with an approved spiritual advisor who represents his faith-preference sub-group twice a month for up to two hours per session.  (DX-A, Pierce Aff. at ¶ 9).

The TDCJ provides unit worship services on a generic basis to the five major faith group categories: (1) Christian non-Roman Catholic, (2) Roman Catholic, (3) Judaism, (4) Islam, and (5) Native American.  Id. at ¶ 10.  Within each major category there are subgroups; for example, under Christian non-Roman Catholic, there are Baptists, Lutherans, and Methodists.  Id.  The TDCJ cannot satisfy the requirements of each subgroup's distinct beliefs and worship practices. Id.  Instead, the services are structured in such a manner to employ that which is common within the major faith group category so that participants experience some portion of the traditions specific to his sub-group.  Id.  Some groups, such as the Church of Jesus Christ of Latter Day Saints and the Jehovah's Witnesses, do not meet the criteria for inclusion in any subgroup of the five major distinctive religious groups.  Id. at ¶ 11.  Members of these groups are allowed to meet for study and fellowship if the need to do so is presented to the unit chaplain and if the resources are available without compromising the safety and security of the unit.  Id.

As of September 15, 2005, the number of offenders designating their religious preference as Native American was 2,522, out of 160,381, accounting for less than two percent of the total prison population.  (DX-A, Pierce Aff. at ¶ 13).  To meet the needs of the inmates practicing

Native American religions, the TDCJ has developed a comprehensive plan.  (Pierce Aff. at ¶ 14 & Tabs 1, 2, & 3).  In developing the plan, TDCJ officials consulted with experts in Native American religious practices.  (DX-A, Pierce Aff. at ¶ 14).  The plan includes employing a Native American chaplain who conducts prayer circles at certain units, and who recruits volunteers to assist him in conducing prayer circles at additional units.  Id.

Mr. Pierce routinely sends letters and makes telephone calls to the sixty-plus known Native American resource groups in the region, but rarely gets a response or follow-up commitment from these tribes or organizations.  Id.  Despite his and other individuals' efforts, they have been unable to obtain sufficient volunteers for every unit.  Id. at ¶ 15.  It took Mr. Pierce almost two years to find and hire the two Native American Chaplains who are now under contract with the TDCJ at this time.  Id.  One of these chaplains contracted with the TDCJ in 2005, but the other started just four months ago, in January 2006.  Id.

At the time plaintiff's claims arose, Mr. Teel was the only chaplain contracted with the TDCJ to conduct Native American ceremonies.  (DX-A, Pierce Aff. at ¶ 15).  He was responsible for covering all of the Native American designated units, except the Daniel Unit in Snyder, Texas, and the Neal Unit in Amarillo, Texas.  Id.  It took Mr. Teel one to two months to cover the entire circuit of units.  Id.  Due to the lack of chaplains and qualified volunteers, it was often impossible for Mr. Teel to conduct more than one ceremony per unit during a given month. Id.

Currently, Native American prayer circles are held at the following units: Hughes, Gatesville, Murray, Michael, Central, Mountain View, Stevenson, Daniel, Neal, Gurney, Ramsey III, and McConnell.  (DX-A, Pierce Aff. at ¶ 16 & Tab 6).  According to the plan,

inmates may be transferred to units that have prayer circles, provided the transfer is not in conflict with any medical restrictions or security classification.  (DX-A, Pierce Aff. at ¶ 16 & Tab 6).  However, even if an inmate is not transferred to a unit where prayer circle is held, inmates are given the opportunity to practice their faith by possessing approved religious items and literature, and by meeting with a spiritual advisor.  Id.

Pursuant to TDCJ policy, all religious devotional items must be approved and used as authorized by the TDCJ.  (DX-A, Pierce Aff. at ¶ 17).  This limitation is imposed to ensure the safety and security of the facilities and to limit the trafficking and trading of items among offenders.  Id.  Offenders who do not follow the established procedure for obtaining approval and ownership, misuse a religious item, or present a security risk based on documented behavior may be denied devotional items.  Id.

Native American religious practices are diverse among the 500 tribes recognized by the federal government; however, there are components of the religion that are common among many of the tribes.  Id. at ¶ 18.  The TDCJ has approved the following devotional items for Native American believers: (1) a headband (worn in cell and dorm, or to and from religious ceremonies or meetings); (2) natural objects consisting of sacred stones (seven marble size permitted), feather (one permitted), shell (one palm-size permitted), bone (subject to unit approval), tooth (subject to unit approval), and plant (sage, sweet grass, or cedar (subject to approval of the unit warden and chaplain)); (3) a medicine bag consisting of a two-inch square, animal skin pouch containing some natural objects such as a stone, piece of wood, animal parts, or herbs with leather or fabric throng worn around the neck (wear is limited to the cell and dorm

area, or to and from religious services); and (4) a medicine wheel medallion.  (DX-A, Pierce Aff. at ¶19 & Tabs 4, 7).

Nathaniel Quarterman is the TDCJ-CID Deputy Director for Prison and Jail Management.  (DX-B, Quarterman Aff. at ¶ 1).  He has worked in a variety of security-related positions for over twenty years.  Id.

TDCJ created the Criminal Institutions Division in September 2003 through a merger of the Institutional Division, Operations Division, Private Facilities Division, and the State Jail Division.  (DX-B, Quarterman Aff. at ¶ 3).  The facilities must be operated in a fiscally sound manner.  Id.  As of August 31, 2004, the TDCJ held 150,709 offenders in 106 facilities.  Id. Approximately 54 percent of those offenders were incarcerated for violent offenses including homicide, assault, rape, kidnaping, robbery, and sexual assault, while the remaining were incarcerated for drug, property, and other offenses.  Id.

As of August 31, 2004, the TDCJ-CID employed 27,370 security staff to manage the offenders.  Approximately 6,000 of the security staff members had less than one year of experience.  (DX-B, Quarterman Aff. at ¶ 4).  The average correctional officer, a CO III, earns approximately $2,400 per month.  Id.  Due to the low pay and stressful working conditions, TDCJ-CID has difficulty retaining employees.  Id.  It currently has approximately 2,900 job openings.  Id.  Some units may operate at 72 percent of their authorized staffing levels.  Id.

The TDCJ does not have the staff, space, and time to comply with every request for meetings, classes, devotional items, special diets, and other privileges requested by members of the 150 faith groups represented in the prison system.  (DX-B, Quarterman Aff. at ¶ 7).  As a state agency, the TDCJ operates within a budget allocated by the Texas legislature.  Id.  Units are

9

staffed to meet all primary and appropriate levels of supervision, and are not staffed to manage large numbers of indeterminate meetings, monitor large numbers of devotional items, provide special diets, and grant special privileges for religious reasons.  Id.  The TDCJ relies on donations for religious materials and devotional items.  Id.  Despite these limiting factors, the TDCJ held 65,651 religious services with a total offender attendance of 2,798,946 in Fiscal Year 2004.  Furthermore, approved volunteers provided 455,287 hours of services in 102,935 visits. Id.

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  Id. Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider

affidavits that relied on hearsay statements); <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).  Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  <u>King v. Dogan</u>, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  Fed. R. Civ. P. 56(e); <u>Anderson</u>, 477 U.S. at 248.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  <u>Caboni</u>, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed."  <u>Anderson</u>, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact.  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  <u>Id.</u> at 248.

# V. **ANALYSIS**

Plaintiff claims that defendants are denying him the opportunity to attend Native American religious ceremonies because they have (1) failed to hire an adequate number of Native American chaplains, or to enlist volunteers to conduct the ceremonies; and (2) refused to let him conduct the ceremonies himself with prison personnel present when outside volunteers are not available.  He contends that defendants' failure to accommodate his religious practices amounts to violations of his First and Fourteenth amendment rights, and violations pursuant to RLUIPA.

Imprisonment necessarily entails a loss of numerous rights and liberties.  Muhammad v. Lynaugh, 966 F.2d 901, 902 (5th Cir. 1992).  A prisoner is not free to do that which he might wish to do, nor may he necessarily engage in permissible activities at a time and in a manner he might prefer.  Id.  Several constitutional rights are protected, however, including the right to practice one's religious beliefs.  Id.  Restrictions to an inmate's practice of religion must be reasonably related to legitimate penological interests.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safley, 482 U.S. 78, 89-90 (1987).  Turner established a four-factor "rational relationship" test for analyzing the constitutionality of regulations that burden a prisoner's fundamental rights.  482 U.S. 89-91.  Under the Turner test, the court must consider: (1) whether there exists a valid, rational correlation between the prison regulation and the legitimate governmental interest advanced; (2) whether there are alternative means of exercising the rights that remain available to the inmates; (3) what is the impact on prison staff, other inmates, and the allocation of prison resources generally; and (4) whether there is an absence of ready alternatives to the regulation in question.  Id.

12

A.      **Equal Protection Under the Fourteenth Amendment.**

Plaintiff first complains that he is being denied equal protection under the Fourteenth Amendment because he is not permitted to meet with other Native American worshipers without a chaplain or volunteer present.  The Fourteenth Amendment requires that all persons similarly situated shall be treated alike, but it does not demand "that every religious sect or group within a prison – however few in numbers – must have identical facilities or personnel."  Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972) (per curiam); see also Plyler v. Doe, 457 U.S. 202, 216 (1982) (explaining that the Equal Protection Clause "does not require [people who] are different in fact or opinion to be treated in law as though they were the same.").  The Fifth Circuit has held that "... disparate impact alone cannot suffice to state an Equal Protection violation; otherwise, *any* law could be challenged on Equal Protection grounds by whomever it has negatively impacted."  Johnson v. Rodriguez, 110 F.3d 299, 306 (5th Cir. 1997) (italics in original) (citing Washington v. Davis, 426 U.S. 229, 246-50 (1976)).

Prison administrators must provide inmates with "reasonable opportunities ... to exercise the religious freedoms guaranteed by the First and Fourteenth Amendments."  Cruz, 405 U.S. at 322 n.2.  In order to succeed on his Equal Protection claim, plaintiff must prove that a defendant acted with a discriminatory purpose, which resulted in a discriminatory effect among persons similarly situated.  Muhammad, 966 F.2d at 903 (no discrimination where prison chaplain refused to let plaintiff make copy of tape when it was chaplain's only copy).   Discriminatory purpose in an equal protection context implies that the decision maker selected a particular course of action in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group.  Johnson, 110 F.3d at 306.

13

In his amended complaint, plaintiff asserted that he was not receiving equal protection of the law because he is able to participate in a Native American religious ceremony only once every two or three months, while "Protestants have services ONCE a week, and the Catholics have Mass TWICE a week, the Jewish community has services ONCE a week and the Muslim communiyty [sic] has services every week."  PAC at 3.  However, even if true, plaintiff has failed to offer any evidence to suggest, let alone prove, that either defendant acted with discriminatory purpose in failing to provide him with more religious ceremonies.  In fact, Mr. Pierce lamented that he routinely wrote and called over sixty Native American resource groups in the region, but that he rarely got a response or commitment from these tribes or organizations. (DX-A, Pierce Aff. at ¶ 14).  In addition, it took him over two years to hire the two Native American chaplains that are now under contract with the TDCJ, the last one being hired only four months ago.  Id. at

¶ 15.  When plaintiff filed suit, the TDCJ employed only Mr. Teel and, due to the large geographical area and the number of units he had to visit, it took him anywhere between one to three[4] months to complete the entire circuit, thus reducing the amount of ceremonies any one unit could have.  Id.

In his summary judgment response, plaintiff argues that Mr. Pierce did not begin his efforts to search for a second Native American chaplain until after he filed suit, and that the lack of ceremonies has been an ongoing problem since 1991.  (See PR at 4).  However, he has

---

[4] Plaintiff claims that services were available only once every two to three months, while defendants claim that Mr. Teel completed the circuit once every one to two months.  Assuming as true that plaintiff was afforded religious ceremonious only once every three months, as discussed infra, he fails to demonstrate that the infrequency of the services was a result of discrimination.

14

presented no evidence to support this allegation.  Moreover, even if it were true, he still fails to demonstrate discrimination.  Mr. Pierce testified as to the TDCJ's preference for having Native American chaplains conduct the Native American services rather than enlist a non-Native American chaplain to preside over the religious ceremonies.  By mere virtue of the Native American population being a small minority,[5] there are necessarily fewer Native American chaplains available to hire.  Plaintiff has provided no evidence to counter Mr. Pierce's statement that the TDCJ preferred a Native American chaplain and that it was difficult to find such an individual, despite his due diligence in attempting to locate one.

Moreover, despite the recruiting problem, the TDCJ provides plaintiff and other inmates who practice the Native American religion with numerous, reasonable opportunities to exercise their religious freedoms.  (See DX-A, Tabs 3-6).  As with other faith groups, Native American followers may keep certain devotional texts and items in their cells and may meet with spiritual advisors.  (DX-A, Pierce Aff. at ¶¶ 6, 9 & Tab 2 at ¶¶ VI – IX).  The TDCJ seeks to utilize religious volunteers as well as ministerial visitation.  (DX-A, Tab 2 at ¶¶ VIII – IX).

Plaintiff also complains that there is a lack of volunteers to conduct the Native American ceremonies, and that a solution would be to allow the inmates themselves to perform the ceremonies with a TDCJ staff member present.  (PAC at 6).  However, Mr. Pierce testified that "[s]ecurity for religious activities is provided by the TDCJ security budget, and is not a cost allocated to Chaplaincy."  (DX-A, Pierce Aff. at ¶ 9).  Thus, Mr. Pierce does not have the

---

[5] Approximately 1.5 percent of the United States population is reported as American Indian. http://factfinder.census.gov/servlet/QTTable?_bm=y&-geo_id=01000US&-qr_name=DEC_2000_SF1_U_QTP5&-ds_name=DEC_2000_SF1_U.

authority to order additional security to monitor such meetings.  Moreover, to hold meetings at

the McConnell Unit, every religious group (with the exception of Muslims whose situation is

governed by a separate court order)[6] is required to have outside volunteers present.  See Adkins

v. Kaspar, 393 F.3d 559, 566 (5th Cir. 2004) (noting that all religious groups, except Muslims,

must have a volunteer present, and that members of the Yahweh Evangelical Assembly ("YEA")

were not denied equal protection when required to have a volunteer or church elder present at all

meetings).  Plaintiff's claim for equal protection fails.  Accordingly, defendants are entitled to

summary judgment in their favor on this claim, and plaintiff's Equal Protection claim is

dismissed with prejudice.

**B.**     **Right to Exercise Religion Under the First Amendment.**

To establish a free exercise clause violation, plaintiff must demonstrate both that

defendants have (1) "placed a substantial burden on the observation of a central religious belief

or practice," Hernandez v. Commissioner, 490 U.S. 680, 699 (1999), and (2) that the defendants'

conduct is not "reasonably related to legitimate penological interests."  O'Lone, 482 U.S. at 349.

In an analogous case, a Texas state inmate who belongs to the YEA sued the TDCJ

officials arguing that he was substantially burdened by not being allowed to meet and assemble

on every Sabbath and holy day in violation of the First Amendment.  Adkins, 393 F.3d at 562.  A

YEA elder testified that the YEA requires its followers to meet together on every Sabbath and to

congregate and make particular observations on specific holy days.  Id.  The elder further

---

[6] Certain religious rights of TDCJ Muslim inmates are governed by a consent decree entered
in Brown v. Beto, 4:74cv069 (S.D. Tex. 1977).  In particular, the consent decree provides a formula
that determines the number of Muslim chaplains based on the number of Muslim inmates.  See
Gooden v. Crain, 405 F. Supp.2d 714, 719 (E.D. Tex. 2005).

explained that he went to the Coffield Unit once a month to oversee Sabbath observances, but he was unable to attend more often because of the distance and the effect on his own personal and religious obligations.  Id.  Two volunteers testified that they had completed the volunteer program so that they could oversee Sabbaths at the Coffield Unit; however, neither one had yet been cleared by prison officials to lead meetings on their own.  Id. at 563.  The plaintiff testified that he had lay-in passes to attend Sabbath and holy days, but complained that he and other members had been denied the right to assemble and hold services on their own.  Id.  The prison official indicated that the plaintiff and other YEA members could meet as long as an accredited YEA volunteer was present.  Id.

Employing the Turner four-part test, the Fifth Circuit held the prison policy permitting inmates to congregate for religious activities only when qualified free world volunteers were present did not place a substantial burden on the free exercise of religion.  Id. at 563-64, 571.  In considering the first step in the Turner analysis, the Fifth Circuit held:

> [W]e must consider the impact of granting Adkins injunctive relief on "guards and other inmates, and on the allocation of prison resources generally." ... Requiring the defendants to accommodate every religious holiday and requirement of the YEA, regardless of the availability of volunteers, space or time, could "spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates and prison resources."

Id. at 565 (quoting Freeman v. Texas Dep't of Criminal Justice, 369 F.3d 854, 862 (5th Cir. 2004)).

Like the plaintiff in Adkins, plaintiff argues that he should be allowed to conduct the religious ceremony with security personnel present.  The Fifth Circuit has found that the TDCJ need not make such an accommodation, and that there is no First Amendment violation.  Adkins,

393 F.3d at 571 (the requirement of an outside volunteer – which is a uniform requirement for all religious assemblies at the Coffield Unit with the exception of Muslims – does not place a substantial burden on litigant's religious exercise).

Moreover, Mr. Quarterman testified that to allow inmates to conduct their ceremonies without an outside volunteer would raise serious security issues.  (DX-B, Quarterman Aff. at ¶ 9).  In particular, he explained that the accommodation for use of tobacco by Native Americans in their ceremonies has proved particularly problematic:

> Offenders found in possession of tobacco products, paraphernalia or similar products may be charged with a disciplinary offense. Thus, its use in Native American religious ceremonies must be carefully monitored, and only Native American chaplains or qualified volunteers may lead the ceremonies.  We simply cannot permit offenders to conduct the ceremony on their own.  Second, the Native American offenders are given a privilege no other offenders receive – permission to violate a prison rule for religious reasons.  To the best of my knowledge, no other offender has been accorded the right to violate a prison rule for religious reasons. For example, Catholic offenders are not permitted to take wine at Communion.  This has created some resentment among offenders.

Id. at ¶ 11.

TDCJ's policy of requiring qualified chaplains or volunteers to conduct Native American religious ceremonies, instead of the inmates themselves, due to security, staff, and resource concerns meets the rational relationship standard set forth in Turner.  Moreover, the Fifth Circuit has held that the first factor in the Turner test, whether there is a rational relationship between the regulation and the legitimate government interest advanced, is the controlling question, and the other factors merely help a court determine if the connection is logical.  Scott v. Miss. Dep't of Corr., 961 F.2d 77, 81 (5th Cir. 1992) (commenting that neither Turner nor O'Lone require courts to weigh evenly, or even consider the other three factors).

Moreover, in this case, defendants have provided evidence that plaintiff is afforded alternative opportunities to practice his religion when a qualified chaplain or volunteer is not available.  (DX-A, Pierce Aff. at ¶¶ 16-19, & Tabs 4, 7).  As the Fifth Circuit has noted, "[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith."  Freeman, 369 F.3d at 861 (citation omitted).  For example, plaintiff is permitted to maintain certain personal, religious devotional items in his cell which he may use to study and worship.  (DX-A, Pierce Aff. at ¶¶ 6, 16).  The Chaplaincy Records from the McConnell Unit show that plaintiff was able to attend Native American classes and numerous religious ceremonies, including mandatory Native American holidays, from July 2001 through March 2006.  (See DX-D).[7]  Despite the lack of Native American chaplains, it cannot be said that defendants have denied plaintiff the right to exercise his faith.  Therefore, defendants are entitled to summary judgment on plaintiff's first amendment claim.

## C.      Statutory Rights Pursuant To RLUIPA.

The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000c-1(a), provides that no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling interest.  RLUIPA imposes the strict scrutiny test on prison

---

[7] Exhibit D is 474 pages and lists the dates and times plaintiff was given a lay-in pass to attend a Native American event such as a class, class set-up, library, library set-up, and Circle worship.

regulations; however, the courts are to apply that standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  Cutter, 544 U.S. at 723 (citation omitted).  The Supreme Court specifically noted that "[l]awmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions."  Id.; see also id. at 722 (RLUIPA will be applied "in an appropriately balanced way, with particular sensitivity to security concerns."). The Court further explained that, while RLUIPA adopts a compelling governmental interest standard, "'context matters' in the application of that standard."  Id. at 723.  Prison security, in and of itself, is a compelling state interest, and deference is due to institutional officials' expertise in this area.  Id. at 724 n.13.  RLUIPA does not elevate accommodation of religious observances over a prison's need to maintain order and safety, and any accommodation must be measured so that it does not override other significant interests.  Id. at 722.  A prison is free to resist requests for religious accommodations that either impose unjustified burdens on other prisoners, or jeopardize the effective functioning of a prison.  Id. at 726.

The burden of proof is on plaintiff to demonstrate that the complained of government practice imposes a substantial burden on his religious exercise under RLUIPA.  Adkins, 393 F.3d at 567.  A governmental action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the offender to significantly modify his religious behavior and significantly violates his religious beliefs.  Id. 568-69 & n.37.  Specifically, the Fifth Circuit has determined:

> [T]he effect of a government action or regulation is significant
> when it either (1) influences the adherent to act in a way that

> violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.  On the opposite end of the spectrum, however, government action or regulation does not rise to a level of a substantial burden on religious exercise if it merely prevents the adherent from enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.

Id. at 570.

The Fifth Circuit has explained that "the Supreme Court's express disapproval of any test that would require a court to divine the centrality of a religious belief does not relieve a complaining adherent of the burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion."  Id. Subsequently, in Cutter, the Supreme Court came to a similar conclusion, finding that prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic: "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, see 42 U.S.C. § 2000cc-5(7)(A), the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."  Cutter, 544 U.S. at 725 n.13 (citing Gillette v. United States, 401 U.S. 437, 457 (1971) ("'[T]he "truth" of a belief is not open to question; rather, the question is whether the objector's belief's are 'truly held.'") (quoting United States v. Seeger, 380 U.S. 163, 185 (1965))).

In this case, TDCJ permits inmates to worship according to their faith preference in their cells using allowed devotional items, such as sacred texts and writings.  (DX-A, Pierce Aff. at ¶ 6).  Native Americans in particular are permitted to possess a headband, sacred stones, a feather, a shell, a medicine bag, and a medicine wheel medallion.  (DX-A, Pierce Aff. at ¶ 19 &

21

Tab 4).  With Unit approval, a Native American inmate may also possess bone, tooth, and plant

devotional items.  (DX-A, Tab 4).  The TDCJ regulations provide for group circle ceremony and

pipe ceremony where "available space, appropriate supervision, and weather conditions permit."

(DX-A, Tab 4 at 3).  Private worship, including symbolic smudging without the smoldering

plant, is authorized in an inmate's cell or immediate bunk area, and TDCJ personnel are

instructed "to respect personal religious observance by offenders," although they may interrupt

private observance for appropriate unit concerns.  Id.

      Both Mr. Pierce and Mr. Quarterman testified that the religious rights of all inmates are

tempered by the security needs of the prisons.  Mr. Quarterman stated:

> Experience has shown us that meetings are used by offenders to
> organize gangs, pass information, make plans, and engage in
> illegal activities.  Thus it is always necessary for security
> personnel, employees or qualified volunteers to monitor group
> activities, whether they be vocational, educational, recreational, or
> religious.

(DX-B, Quarterman Aff. at ¶ 9).  The Fifth Circuit has held that the TDCJ did not substantially

burden an offender's right to exercise his religion when it required an outside volunteer to be

present at worship ceremonies based on security concerns.  Adkins, 393 F.3d at 571.  Plaintiff's

situation is similar to the plaintiffs in Adkins: he has proposed an alternative means to increase

the number of religious ceremonies he might attend, that is, having inmates practicing the Native

American religion conduct the ceremonies themselves without either a chaplain or outside

volunteer present, but only TDCJ personnel.  Both Mr. Pierce, head of the Chaplaincy

Department, and Mr. Quarterman, who has been in security for twenty years, testified that such

an arrangement would be unadvisable and would pose unnecessary security risks.  The Fifth

Circuit found that there was a valid rational correlation between the prison regulation of not

permitting inmates to conduct ceremonies themselves and the legitimate governmental interest,

that is, prison security.  In addition, the undisputed evidence shows that Native American

inmates are permitted to practice their religion in many ways.  Thus, defendants are entitled to

summary judgment on plaintiff's RLUIPA claim.

## VI.  CONCLUSION

The uncontested facts establish that the restrictions imposed on plaintiff's ability to

exercise his religion are reasonably related to legitimate penological concerns such as security

and safety of the staff and inmates, costs, and management of prison resources.  In addition, the

uncontested facts establish that plaintiff is able to exercise his religion through personal study

and devotion in his cell, attendance at Native American classes, opportunities to visit the Native

American library, and worship times in the Circle and pipe ceremonies when available.

Although these ceremonies are not conducted as often as other faith preferences ceremonies, the

discrepancy is not due to discrimination or any other constitutional violation.  Accordingly,

defendants' motion for summary judgment, (D.E. 78), is GRANTED.  Plaintiff's claims are

dismissed with prejudice.

ORDERED this 21st day of June 2006.

BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE